UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| John Plevritis, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 06 C 3401 |
| ) | |
| The City of Chicago, a Municipal Corporation, ) | |
| and Chicago Police Officers Kenneth Stoppa, ) | |
| David Kumiega, and Mark Kushiner, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Judge:

The Plaintiff, John Plevritis ("Plaintiff"), filed a seven-count amended complaint against the Defendants, the City of Chicago and Chicago police officers Kenneth Stoppa, David Kumiega, and Mark Kushiner, alleging various federal and state law claims. Before us are the Defendants' joint motion for summary judgment on all counts and Plaintiff's request to "withdraw" certain claims. For the reasons set forth below, Defendants' motion is granted in part and denied in part. Plaintiff's request is construed as a motion for voluntary dismissal and granted.

### I. BACKGROUND

The undisputed facts are as follows. Plaintiff John Plevritis is a Chicago resident. (Pl. Statement of Facts at ¶ 1.) In 2002, Plaintiff met Stephanie Stobiecki ("Stobiecki"), who is not a party to this action, and the two began dating shortly thereafter. (*Id.* at ¶ 2.) Subsequently, Stobiecki often stayed at Plaintiff's home, located at 2814 North Meade. (*Id.*) Stobiecki had a key

1

to the house, knew the code for the burglar alarm, and kept many of her belongings there. (*Id.*; Def. Statement of Facts at ¶ 11.)

Since 2001, Stobiecki has owned and operated Lasko's, a bar located in Chicago. (Pl. Statement of Facts at ¶ 2.) Defendant Kenneth Stoppa ("Stoppa"), a Chicago police officer, was a regular at Lasko's and a friend of Stobiecki's. (*Id.* at ¶¶ 2-3.) On multiple occasions, Stoppa gave Stobiecki rides to Plaintiff's house after she closed the bar, and the two would often sit in his car talking for twenty minutes or more. (*Id.* at ¶ 3.) Further, Stoppa would perform "other little favors" for Stobiecki. (*Id.*)

Plaintiff's relationship with Stobiecki ended approximately three months before the June 22, 2004 incident giving rise to this litigation. (Pl. Statement of Facts at ¶ 4.) At some point thereafter, Plaintiff changed the locks on his house and the code on the burglar alarm, and informed Stobiecki that she was not welcome to visit. (*Id.*) Subsequently, Stobiecki began living with a new boyfriend, Gianni Pincente ("Pincente"). (*Id.*) On June 20, 2004, Plaintiff was arrested at Lasko's in connection with an alleged assault and battery against Stobiecki. (Def. Statement of Facts at ¶ 13.) The following day, Plaintiff and Stobiecki agreed to meet on June 22 so that she could remove her property from Plaintiff's house. (Pl. Statement of Facts at ¶ 4.) Stobiecki then contacted Stoppa, who agreed to meet her at Plaintiff's home to deter any potential problems with Plaintiff. (*Id.* at ¶ 5.)

Stoppa testified that he arrived at Plaintiff's house at about 12:25 PM the following day, and that he had to wait approximately twenty minutes for Stobiecki to arrive. (Pl. Statement of Facts at ¶ 7.) When she finally did arrive, Stobiecki was accompanied by her new boyfriend, Pincente, and Dave Langley, who she employed as a bouncer at Lasko's. (*Id.* at ¶ 6.) The four had to wait

for Plaintiff to arrive, as Stobiecki did not have a key to the house. (*Id.* at ¶ 8.)[1] Stoppa told Stephanie that he was unable to wait much longer, so she repeatedly called Plaintiff several times demanding that he come immediately so that she could retrieve her belongings. (*Id.*)

Rather than continuing to wait for Plaintiff to arrive, Stobiecki broke into the house through a window by cutting a screen and having Pincente hoist her into the house. (*Id.* at ¶¶ 10-11.) This triggered the burglar alarm, which produced both a localized, audible alarm and also remotely alerted the alarm company to the break-in. (*Id.* at ¶¶ 12-14.) Stobiecki then called Plaintiff and informed him that she had broken into the house. (*Id.* at ¶ 13.) Plaintiff, in turn, called 911 to report the break-in and proceeded to his house. (*Id.* at ¶¶ 15, 17.) At about 1:05 PM, the alarm company called Plaintiff's home number to inquire about the alarm; Stobiecki answered the phone and informed them that she was Plaintiff's ex-girlfriend and that she had broken into the house. (*Id.* at ¶ 14.) Accordingly, the alarm company informed Stobiecki that they were going to call the police. (*Id.*) Stobiecki then tore the alarm unit from the wall and proceeded to start moving her belongings out of the house. (*Id.* at ¶ 14.) During this course of events, Stoppa's squad car was parked in an alley adjacent to the window that Stobiecki entered. (*Id.* at ¶10.) Because of the 911 calls placed by both Plaintiff and the alarm company, the police issued a radio call. (*Id.* at ¶ 16.) Subsequently, Stoppa called two of "his guys," Officers David Kumiega ("Kumiega") and Mark Kushiner ("Kushiner"), who subsequently arrived at the scene. (*Id.* at ¶ 16.)

Plaintiff arrived to find Stobiecki and Stoppa in his living room, at which point he asked

---

[1] Notably, Defendants do not dispute Plaintiff's statement that Stoppa "knew that [Stobiecki] did not have access to the house, and knew that [she] did not have a key to get into the house." (*Id.* at ¶ 8.)

3

what Stoppa was doing in his house and inquired as to why he was not arresting Stobiecki. (Pl. Statement of Facts at ¶ 18.) Stoppa responded that Stobiecki had given him permission to search the house, prompting Plaintiff to inform him that she did not live there. At that point, Stoppa said that they would "let the judge decide" the issue. (*Id.*; Def. Statement of Facts at ¶ 29.) Officers Kushiner and Kumiega then confronted Plaintiff, forcing him to sit down on his couch while they proceeded to search his house without a warrant, over his objections. (Pl. Statement of Facts at ¶ 19, 21.) During the search, Stobiecki went into Plaintiff's back yard and started the motor on a boat that Plaintiff had stored in his back yard, causing damage to it. (*Id.* at ¶ 22.) Plaintiff complained to Stoppa, asking "why he let [Stobiecki] do that," and Stoppa responded that "it's her house, she can do what she wants." (Def. Statement of Facts at ¶ 31.) However, the officers later ordered Stobiecki to stay out of the house. (*Id.*)

Plaintiff made several cell phone calls while the officers were searching his house. (Pl. Statement of Facts at ¶ 24.) Specifically, Plaintiff called a friend to complain that he was being mistreated by police officers; consequently, that same friend dialed 911 to request that a superior officer be dispatched. (*Id.*) Based on these calls, OEMC called Plaintiff's house, and Plaintiff answered the phone while the Defendant-Officers were nearby. They instructed him to tell the operator that everything was fine. According to Plaintiff, he felt threatened, and so complied with their requests.

At some point, the officers handcuffed Plaintiff, placed him in a squad car, and did not allow him to use his cell phone. (*Id.* at ¶ 25.) At some other point, the Defendant officers uncovered 234 grams of marijuana, five firearms, and ammunition. (Def. Statement of Facts at ¶ 43.) The officers informed Plaintiff of the guns and drugs that they found, and only then had him sign a blank

4

consent-to-search form. (Pl. Statement of Facts at ¶ 27.) After Plaintiff signed the consent-to-search form, the Defendant-Officers called in a canine unit to further search the house. (*Id.* at ¶ 28.) Plaintiff was transported, processed, and ultimately charged in relation to the marijuana and firearms taken from his residence. (*Id.* at ¶ 47.) Ultimately, however, Plaintiff prevailed on a motion to suppress evidence based on the illegal search of his house, and the criminal case was in turn dismissed. (Pl. Statement of Facts at ¶ 36.)

## II. STANDARD OF REVIEW

Summary judgment is proper when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). This standard places the initial burden on the moving party to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations omitted).

Once the moving party meets this burden of production, the nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleading" but, rather, "must set forth specific facts showing that there is a genuine issue [of material fact] for trial." Fed. R. Civ. P. 56(e).

## III. ANALYSIS

### A. Count III: Illegal Search of Plaintiff's Home

The Defendants move for summary judgment on Count III, which alleges that the Defendant-Officers conducted an illegal search of the Plaintiff's house, on grounds that the search of Plaintiff's

5

house was, as a matter of law, legal. The Defendants offer two justifications for the search: first, that Stobiecki had apparent authority to consent to the search of the house or, alternatively, that the search was reasonable due to exigent circumstances. Both arguments lack merit.

First, in assessing whether Stobiecki had apparent authority to consent to the search, we "must look for indicia of actual authority." *United States v. Miller*, 800 F.2d 129, 134 (7th Cir. 1986). Actual authority to consent to a search exists where there is "mutual use of [a] property by persons generally having joint access or control for most purposes." *U.S. v. Groves*, 470 F.3d 311, 319 (7th Cir. 2006). The question, then, is whether it is clear from the record that it was reasonable for the Defendant-Officers to conclude that Stobiecki had authority to consent to the search. *See id.* ("The factors the police should consider when making their objective determination of whether someone has apparent authority are by necessity the same factors that make up actual authority.")

To provide a brief recap, it is undisputed that Officer Stoppa arrived at the house first, and that subsequently he, Stobiecki, Pincente, and a bouncer waited for Plaintiff to arrive so that Stobiecki could get into the house. Stobiecki could not get into the house because she did not have a key. Feeling that she could no longer wait, Stobiecki forcibly entered the house through a window, setting off a burglar alarm. Then Plaintiff arrived to find the Defendant-Officers in his house, at which point he told them to leave, insisting that Stobiecki did not live there and demanding that they arrest her. This all happened well before the officers commenced the search. Nonetheless, Defendants now ask us to find that Stobiecki had apparent authority to consent to the search. That is unthinkable, and would be so even if we were to look only to the undisputed fact that Stobiecki forced her way into Plaintiff's home and set off a burglar alarm while Stoppa was present, to say nothing of the undisputed fact that the Plaintiff *explicitly told* the Defendant-Officers that Stobiecki

no longer lived at his home before they conducted the search.

Alternatively, the Defendants argue that the search was justified by exigent circumstances. Specifically, they contend that an immediate, warrantless search was necessary for the safety of the Defendant-Officers and others, as well as to prevent the destruction of contraband that the Officers had probable cause to believe was in the house. We are not persuaded.

"[T]he general rule is that warrantless entry into a home to conduct a search is presumptively unreasonable under the Fourth Amendment," *U.S. v. Evans*, 215 F.3d 592, 594 (7th Cir. 2007), and exceptions to the general rule are "jealously and carefully drawn." *See, e.g.*, *U.S. v. Groves*, 470 F.3d 311, 318 (7th Cir. 2006). Here, the Defendants point to various evidence suggesting that, at some point before the search at issue, Stobiecki began shouting that the Plaintiff kept "guns and drugs" in the house. It follows, Defendants argue, that it was necessary for the Officers to conduct an immediate, warrantless search in order to protect the safety of all involved, as well as to prevent the destruction of contraband. Although it is true that those concerns can, in some circumstances, justify a warrantless search, the Defendants have failed to meet their burden.

At the hearing on Plaintiff's motion to suppress evidence in the state criminal case, Stobiecki testified that she told Stoppa that the Plaintiff had firearms and drugs "[e]ither the night before or [the morning of]" of the incident. (Pl. Response Ex. 4, at 21.) The Defendants point to no evidence which contradicts that testimony and, accordingly, there is a genuine question as to whether Stoppa knew about the alleged contraband well before the search was conducted. If so, there would have been sufficient time to obtain a search warrant, rendering both prongs of Defendants' exigent circumstances argument little more than *post hoc* rationalizations for the search. *See U.S. v. Andrews*, 442 F.3d 996, 1000 (7th Cir. 2006) ("When reviewing a warrantless search to determine

7

if exigent circumstances existed, this Court conducts an objective review, analyzing whether the government met its burden to demonstrate that a reasonable officer had a 'reasonable belief that there was a compelling need to act and no time to obtain a warrant.' ") (quoting *United States v. Saadeh*, 61 F.3d 510, 516 (7th Cir.1995)). *Cf., e.g.*, *Georgia v. Randolph*, 547 U.S. 103 (2006); *Richards v. Wisconsin*, 520 U.S. 385 (1997); *Mincey v. Arizona*, 437 U.S. 385 (1978).

We reiterate that a genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Stepping away from the specific deficiencies in Defendants' arguments, we more generally observe that there is ample room for a reasonable jury to conclude that the search was illegal. Accordingly, the Defendants motion for summary judgment is denied as to Count III.

B.    **Count VI: Intentional Infliction of Emotional Distress**

Defendants move for summary judgment on Plaintiff's intentional infliction of emotional distress ("IIED") claim on grounds that it is time-barred. There is no dispute that the underlying incident giving rise to this action occurred on June 22, 2004 and that the Plaintiff filed his first complaint on June 22, 2006. The applicable Illinois statute of limitations prescribes that the action must have been "commenced within one year from the date that the injury was received or the cause of action accrued." 745 ILCS 10/8-101.[2] The Defendants argue that the Plaintiff's IIED claim

---

[2]*See Evans v. City of Chicago*, 434 F.3d 916, 934 (7th Cir. 2006) ("The statute of limitations applicable to claims under 42 U.S.C. § 1983 in Illinois is the same two-year provision which governs personal injury actions in the state, 735 ILCS 5/13-202. The limitations period for tort claims, such as intentional infliction of emotional distress, against governmental entities and their employees, however, is only one year pursuant to 745 ILCS 10/8-101.") (internal citations omitted).

accrued on June 22, 2004 – the date of his arrest – while the Plaintiff maintains that the claim did not accrue until the state criminal proceedings against him were terminated in his favor.

We look to Illinois law to determine when Plaintiff's IIED claim accrued. *See Feltmeier v. Feltmeier*, 798 N.E.2d 75, 89 (Ill. 2003). Under Illinois law, a cause of action for "continuing torts" – such as IIED – accrues "at the time the last injurious act occurs or the conduct is abated." *Id.* "[A] continuing tort does not involve tolling the statute of limitations because of delayed or continuing injuries, but instead involves viewing the defendant's conduct as a continuous whole for prescriptive purposes." *Id.* The key question, then, is what act or acts for the basis of the Plaintiff's IIED claim.

The Plaintiff cites a number of cases for the proposition that his IIED claim did not accrue until the conclusion of the criminal proceedings, but all of these cases involved an IIED claim based, at least in part, on an underlying claim for malicious prosecution. Here, the Plaintiff does not allege malicious prosecution. As those cases make clear, this is a critical distinction: in all of them, the court found that the allegedly tortious conduct had not "abated " – and the IIED claim not accrued – until the termination of criminal proceedings precisely because the prosecution *itself* was part of the IIED claim. *See Treece v. Village of Naperville*, 903 F. Supp. 1251, 1256-57 (N.D. Ill. 1995) ("Ordinarily, a claim for malicious prosecution will accrue when the underlying action is terminated in the plaintiff's favor because that is the last act necessary to satisfy all of the elements of a cause of action."); *Bergstrom v. McSweeney*, 294 F. Supp. 2d. 961, 969 (N.D. Ill. 2003) ("As [Plaintiff's IIED] claim incorporates the conduct underlying his malicious prosecution claim, the cause of action did not accrue until the state criminal proceedings against him were terminated."); *Pierce v. Pawelski*, 98 C 3337, 2000 WL 1847778, at *3 (N.D. Ill. Dec. 14, 2000) (Not Reported in F. Supp.

9

2d) ("[Plaintiff's] IIED claim is based not just on the events occurring on the day of his arrest, but on defendants' participation in his wrongful prosecution and their allegedly false testimony at his trial.").

Here, the Plaintiff does not attempt to state a claim for malicious prosecution. Rather, he rests his entire argument that the Defendant Officers' allegedly tortious conduct extended past the day of his arrest on the tenuous notion that his IIED claim incorporates the Defendant-Officers allegedly "false testimony at the hearing on the motion to suppress to try to cover up the break-in to Plaintiff's home and the illegal search." (Pl. Resp. at p.9.) This is a slender reed on which to rely: Plaintiff fails to cite – nor can we find – a single case supporting his argument. To the contrary, as we have already observed, the Plaintiff cites only cases which included malicious prosecution claims and, in turn, allegations of tortious conduct over a broad span of time. This is not surprising; in *Hobley v. Burge*, we observed that "courts in our district have consistently held that the statute of limitations on an IIED claim does not begin to run until the state criminal proceedings are terminated," but explicitly clarified that, in each the relevant cases, "the IIED was found to be timely because it was based on conduct that was the same as that contained in the plaintiff's timely malicious prosecution claim." No. 03 C 3678, 2004 WL 2658075, at *9 (N.D. Ill. Oct. 13, 2004) (not reported in F. Supp. 2d). Put simply, Plaintiff's argument is an unpersuasive attempt to expand the proper temporal scope of his IIED claim in the absence of a malicious prosecution claim. Accordingly, we find that the claim accrued approximately two years before the Plaintiff filed suit. Because the applicable statute of limitations is one year, the claim is time-barred, and we therefore grant Defendants' motion for summary judgment as to Count VI.

C.     **Count I: False Arrest and Imprisonment**

The Defendants move for summary judgment on Count I of Plaintiff's Amended Complaint, false arrest and false imprisonment, on grounds that the Defendant-Officers had probable cause to arrest the Plaintiff once they discovered marijuana and firearms in his house. In his Response, the Plaintiff concedes that there was probable cause for the arrest, but argues that Count I should survive because the "present complaint alleges that [Plaintiff] was subjected to an unreasonable seizure, including being handcuffed and forced to sit in a police car, while the Defendants searched his house *before* any narcotics or weapons were found." (Pl. Resp. at p.10 (emphasis in original)). The Defendants reply that there was probable cause for arrest at that time, as well, because the Defendant-Officers testified that Stobiecki was shouting that the Plaintiff had "guns and drugs."

The Seventh Circuit has "consistently held that an identification or a report from a single, credible victim or eyewitness can provide the basis for probable cause." *Woods v. City of Chicago*, 234 F.3d 979, 996 (7th Cir. 2000). However, given the circumstances, here, we do not see Stobiecki's credibility as an appropriate issue for summary judgment. There is no dispute that Stobiecki and Plaintiff were in a romantic relationship that soured badly. It is also undisputed that Stobiecki damaged the Plaintiff's boat, seemingly out of spite. This was, of course, after she forcibly entered the house and tore an alarm unit from the wall. To say the least, there is ample room for a jury to conclude that Stobiecki fell far short of a "credible victim or eyewitness." In short, the Defendants may very well establish probable cause, but they will have to do it at trial. As such, Defendants' motion for summary judgment on Count VI is granted only insofar as it concerns events following discovery of the contraband, which Plaintiff concedes established probable cause for a subsequent arrest.

**D.    Qualified Immunity**

The Defendants argue that the Defendant-Officers are entitled to qualified immunity on the Plaintiff's Illegal Search and False Arrest claims.[3] "Qualified immunity shields officers from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated. When qualified immunity applies, a defendant is not merely entitled to a defense from liability; he is entitled not to stand trial." *Leaf v. Shelnutt*, 400 F.3d 1070, 1080-81 (7th Cir. 2005) (internal quotations omitted).

In determining whether qualified immunity applies, we first ask "whether the facts alleged make out a constitutional violation." *Id.* at 1081. If so, we determine whether the violated constitutional right "was firmly established at the time of the alleged injury, such that a reasonable officer would understand that his actions are in violation of that right." *Mannoia v. Farrow*, 476 F.3d 453, 457 (7th Cir. 2007). Here, the Defendants' attempted invocation of qualified immunity is strictly conclusory: they merely state that – "given the circumstances" as they have described them throughout their supporting memorandum – the Plaintiff "did not have a clearly established constitutional right of which a reasonable officer would have know not to search, seize, and charge, [sic] Plaintiff for possessing guns and drugs." (Def. Mem. in Support of Mot. for Summary Judgment at pp.11-12.) The record leaves ample room for a jury to find that the Defendant-Officers not only violated the Plaintiff's constitutional rights, but that they did so in ways sufficiently egregious such that a "reasonable officer" would certainly understand them to constitute violations. Qualified immunity is therefore inapplicable, here.

**E.** **Plaintiff's Remaining Claims**

---

[3]Defendants also assert qualified immunity as to the Substantive Due Process claims, discussed below.

The Defendants state that Plaintiff has expressly waived Counts II and IV of the Amended Complaint, which allege Excessive Force and violation of the Plaintiff's right to Due Process under the Fourteenth Amendment of the United States Constitution, respectively. In his response brief, Plaintiff explicitly states his desire to "withdraw" Count IV of the Amended Complaint, but is wholly silent as to his Excessive Force claim. (Pl. Resp. at p.10.) We construe his request to withdraw Count IV – and his silence regarding Count II, taken in light of the other circumstances – as a motion for voluntary dismissal of those counts, and grant the motion.

Finally, the Defendants move for summary judgment on Counts V and VII, which allege Civil Conspiracy and Indemnification, on grounds that summary judgment on all of the other counts is proper. Specifically, the Defendants argue that Plaintiff's conspiracy claim should be dismissed, because it cannot stand on its own and summary judgment is proper on all of the underlying claims. Likewise, they move for summary judgment on the Indemnification claim on grounds that the Defendant City of Chicago cannot be liable to the Plaintiff via indemnification because the individual Defendant-Officers cannot be liable to the Plaintiff. However, because we deny Defendants' motion for summary judgment as to Counts I and III, we in turn deny the motion as to Counts V and VII.

## IV. CONCLUSION

For the reasons discussed above, Defendants' joint motion for summary judgment on all counts is granted as to Count VI, granted in part as to Count I, and denied as to all other Counts.

Plaintiffs request for "withdrawal" of Counts II and IV is construed as a motion for voluntary dismissal of those counts, and granted. It is so ordered.

                                              Honorable Marvin E. Aspen
                                              U.S. District Court Judge

Dated: September 17, 2007